Pages 1 - 70

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Paul S. Grewal, Magistrate Judge

```
                                  )
                                  )
 United States of America,        )    No. CR11-0471 DLJ
                                  )
          Plaintiff,              )
      vs.                         )
                                  )
 Dennis Collins, et al.           )
                                  )
          Defendant.              )
                                  )
                                  )
 _____  )
```

San Jose, California
Friday, February 17, 2012

**TRANSCRIPT OF PROCEEDINGS OF THE OFFICIAL ELECTRONIC SOUND RECORDING**

**APPEARANCES:**

For Plaintiff:
                    MELINDA HAAG
                    United States Attorney's Office
                    Northern District of California
                    150 Almaden Boulevard
                    Suite 900
                    San Jose, CA 95113
              **BY:  HANLEY CHEW**
                    **MATTHEW PARRELLA**
                    **ASSISTANT UNITED STATES ATTORNEYS**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

Transcribed By:     Stacy Wegner
                    Transcriber
                    smwtyping@yahoo.com
                    (859) 539-2802

**APPEARANCES:    (Continued)**

For Defendant Collins:

                        Law Offices of Peter Leeming
                        108 Locust Suite 7
                        Santa Cruz, CA 95062
             BY:   **PETER A. LEEMING**
                   **ATTORNEY AT LAW**


For Defendant Cooper:

                        Law Offices of Michael Whelan, Jr.
                        703 Market Street #913
                        San Francisco, CA 94103
             BY:   **MICHAEL WHELAN, JR.**
                   **ATTORNEY AT LAW**


For Defendant Covelli and Valenzuela:

                        Nolan, Armstrong, Barton LLP
                        600 University Avenue
                        Palo Alto, CA 94301
             BY:   **THOMAS NOLAN**
                   **ATTORNEY AT LAW**


For Defendant Downey:

                        Law Office of John Hamasaki
                        1112 Bryant Street, 3rd Floor
                        San Francisco, CA 94103
             BY:   **JOHN M. HAMASAKI**
                   **ATTORNEY AT LAW**


For Defendant Haefer and Vo:

                        Stanley Cohen and Associates
                        119 Avenue D, Fifth Floor
                        New York, NY 10009
             BY:   **STANLEY L. COHEN**
                   **ATTORNEY AT LAW**


For Defendant Husband:

                        Law Offices of Ean Vizzi
                        506 Broadway
                        San Francisco, CA 94133
             BY:   **EAN VIZZI**
                   **ATTORNEY AT LAW**

**APPEARANCES:    (Continued)**

For Defendant Kershaw:
                        Law Offices of Omar Figueroa
                        7770 Healdsburg Ave
                        Suite A
                        Sebastopol, CA 95472
            **BY:   OMAR FIGUEROA**
                    **ATTORNEY AT LAW**

For Defendant Miles:
                        Law Offices of Graham Archer
                        95 S. Market Street
                        Suite 300
                        San Jose, CA 95113
            **BY:   GRAHAM E. ARCHER**
                    **ATTORNEY AT LAW**

For Defendant Murphy:
                        Carey & Carey
                        P.O. Box 1040
                        Palo Alto, CA 94302-1040
            **BY:   ROBERT E. CAREY, JR.**
                    **ATTORNEY AT LAW**

For Defendant Phillips:
                        Law Offices of Dena Meierhenry
                        1415 Fulton Rd # 205-184
                        Santa Rosa, CA 95403
            **BY:   DENA MEIERHENRY**
                    **ATTORNEY AT LAW**

For Defendant Puglisi:
                        John D. Lueck Inc APC
                        8034 Haven Ave Ste. A
                        Rancho Cucamonga, CA 91730
            **BY:   JOHN D. LUECK**
                    **ATTORNEY AT LAW**

For Defendant Sullivan:
                        Law Offices of Michelle Spencer
                        55 River Street, Suite 100
                        Santa Cruz, CA 95060
            **BY:   MICHELLE D. SPENCER**
                    **ATTORNEY AT LAW**

| | |
|---|---|
| 1 | <u>Friday, February 17, 2012</u>                                    10:05 a.m. |

2

3       **THE CLERK:**  Your Honor, we are calling United States

4  versus Dennis Collins, et al.  Case Number CR11-471.

5       Counsel, please state your appearances.

6       **MR. PARRELLA:**  For the Government, Matt Parrella and

7  Hanley Chew.  Good morning, Your Honor.

8       **THE COURT:**  Good morning, gentlemen.

9       **MR. LEEMING:**  And for Mr. Collins, who is appearing

10  by telephone, Your Honor, Peter Leeming.  Good morning.

11       **THE COURT:**  Good morning.

12       **MR. COHEN:**  Good morning, Your Honor.  Stanley Cohen

13  on behalf of Mercedes Haefer, who has waived.  And I'm also

14  standing in this morning on behalf of Alexis Briggs, who is

15  actually in Minnesota and her client Christopher Vo, who's

16  waived as well.

17       **THE COURT:**  Mr. Cohen, good morning, sir.

18       **MR. COHEN:**  Good morning.

19       **MR. VIZZI:**  Good morning, Your Honor.  Ean Vizzi on

20  behalf of Donald Husband whose appearance is waived.

21       **THE COURT:**  Good morning.

22       **MR. NOLAN:**  Good morning, Your Honor.  Tom Nolan on

23  behalf of Mr. Covelli, who's present, Joshua Covelli.  And

24  also appearing specially for Mr. Thompson, who's at a

25  preliminary hearing on a homicide case previously set, and I'm

1  appearing for Mr. Valenzuela on that matter.

2        **THE COURT:**  Mr. Nolan, good morning, sir.

3        **MR. WHELAN:**  Good morning, Your Honor.  Michael

4  Whelan for Mr. Cooper, whose presence has previously been

5  waived.  Mr. Cooper is available by phone if we need him.

6        **THE COURT:**  All right.

7        **MR. WHELAN:**  Good morning.

8        **THE COURT:**  Good morning, Mr. Whelan.

9        **MR. FIGUEROA:**  Good morning.  Omar Figueroa for

10 Vincent Charles Kershaw whose presence has also been waived.

11       **THE COURT:**  Mr. Figueroa, good morning, sir.

12       **MS. MEIERHENRY:**  Good morning, Your Honor.  Dena

13 Meierhenry on behalf of Drew Alan Phillips whose presence has

14 been waived.

15       **THE COURT:**  Good morning as well.

16       **MR. ARCHER:**  Good morning, Your Honor.  Graham

17 Archer for Ethan Haindl Miles whose presence has been waived.

18       **THE COURT:**  Mr. Archer, good morning, sir.

19       **MR. ARCHER:**  Good morning.

20       **MR. HAMASAKI:**  Good morning, Your Honor.  John

21 Hamasaki on behalf of Keith Wilson Downey whose appearance has

22 also been waived.

23       **THE COURT:**  Mr. Hamasaki, good morning.

24       **MR. LUECK:**  Good morning, Your Honor.  John Lueck on

25 behalf of Jeffrey Puglisi whose appearance has been waived.

1     **THE COURT:** Mr. Lueck, good morning, sir.

2     **MS. SPENCER:** Good morning, Your Honor. Michelle

3 Spencer appearing on behalf of Daniel Sullivan whose

4 appearance has been waived.

5     **THE COURT:** Good morning, Ms. Spencer.

6     **MR. CAREY:** Good morning, Your Honor. Rob Carey.

7 I'm appearing on behalf of James Murphy whose presence has

8 been waived.

9     **THE COURT:** Mr. Carey, good morning, sir.

10     **MR. CARRANZA:** Good morning, Your Honor. Jaime

11 Carranza with U.S. Pretrial Services.

12     **MS. FARAHMAND:** Good morning, Your Honor. Gelareh

13 Farahmand with Pretrial Services.

14     **THE COURT:** All right. Good morning each of you as

15 well. All right. Is there anyone whose appearance has not

16 been made before we turn to the matters at hand? If not, why

17 don't you all take a seat. We've got a lot to cover this

18 morning.

19     I appreciate your filings and have done my best to

20 work through the matrix that you've created for me in terms of

21 joinder and cross-joinder.

22     Without taking up the entire morning reciting

23 exactly my understanding of all the motions that have been

24 filed and all the joinders that have been filed as well, I

25 will simply say that I would like to begin with the motion to

1   compel.

2          I believe it was filed by Ms. Valenzuela, docket

3   192.  I believe it's the most challenging of the issues we

4   need to cover, so I'd like to begin with that.

5          Mr. Nolan, it appears you're going to speak first?

6          **MR. NOLAN:**  Yeah.  I'm going to have to speak for

7   Mr. Thompson and also for Mr. Covelli, since we joined in that

8   matter.

9          **THE COURT:**  All right.  All right.  Well, Mr. Nolan,

10  I -- I believe I understand the -- the parties' positions from

11  the papers, but I'd like to have you explain to me your view

12  of how this return issue relates to the issue of segregation,

13  because as I see it there are really two separate big

14  questions here.

15         The first is whether the Defendants are entitled to

16  a return of the hardware, either in light of a violation of

17  the conditions upon which the seizure of that hardware was

18  authorized, or under the general requirements of Rule 41.

19         So why don't you proceed and --

20         **MR. NOLAN:**  Well, let me ask if -- if there's any

21  counsel who wants to address that issue other than myself?

22         I -- I agree with the Court.  It's two separate

23  issues.  And -- and it appears to me that the -- that if

24  you're going to conduct a search and take a medium that

25  contains a great deal of information -- by the way, it's the -

1  - the information, rather than -- if you're looking at -- at -

2  - at the physical item, they say they're going to forfeit it.

3          Well, that's separate from the information that's

4  contained thereon.  I mean, if you were going to give them a

5  hard drive, for example, and say "Copy everything on to my

6  hard drive," then presumably you're entitled to that, and then

7  you're entitled to make motions to suppress or other motions

8  that might pertain to the -- the seizure that you're not

9  allowed to use, etcetera, whether -- on the scope issue.

10         So you know, I -- I -- I think that we're going to -

11  - we're going to return into more of these kinds of problems,

12  and the question is what burden does the Defendant have to

13  receive back versus what -- what requirement the Government

14  has to return.

15         You know, it's -- it seems to me that -- that they

16  know they're not entitled to these documents because they

17  seize them because it would be -- you know, it would be

18  impossible, in their mind, to sit there and separate it out at

19  the scene, but then they have a duty, and it doesn't appear as

20  if they want to fulfill that duty to take -- to do that step.

21  In other words --

22         **THE COURT:**  It's a duty that's explicitly set out in

23  attachment C, to at least certain --

24         **MR. NOLAN:**  That's right.

25         **THE COURT:**  -- warrants, correct?

1    **MR. NOLAN:**  Absolutely.  Absolutely.  Yeah.  And a -

2  - and a recognition that, you know, we don't want -- we don't

3  want law enforcement to have to sit there in the house with

4  the -- with the computer for a period of a week to go through

5  it.  We're allowing them to take it out.

6    But there's a price for that, and the price is they

7  have to do what they're supposed to do, which is make sure

8  they only seize those things that the warrant in effect tells

9  them they can seize.

10    **THE COURT:**  And I -- I take it your view is that

11  Judge Lloyd, among others, relied upon that representation and

12  commitment in authorizing the seizure?

13    **MR. NOLAN:**  Absolutely.  Absolutely.  And -- and,

14  you know, I think as a practical matter, what happens is is

15  that, you know, it's hard to get law enforcement with such a

16  large quantity of information to understand that they can't

17  work on their other matters.

18    They have a duty to the Defendants at that point to

19  -- to do this, and it -- and it's something that may not be

20  something that they can mark in their little book that it was

21  helpful in the investigation.  It's a requirement they have to

22  do.

23    And I think that -- I think that -- that it's

24  acknowledged by the search warrant.  It's acknowledged that

25  the -- the law that -- you know, that -- that we cited.  And

1    the Government didn't cite anything contrary, other than to

2    say "Well, we're going to try to forfeit these -- these

3    items."

4             Again, even if they forfeited -- even if they

5    forfeited the -- the -- the -- the actual computer, they're

6    still required to give me my information that -- that -- that

7    I'm entitled to.  So I see that as a duty that they have.

8             And -- and I don't see any -- they can't get around

9    it.  Well, I don't know how they can get around that

10   particular duty.  Maybe they can get around it by saying

11   "Okay, we'll give you everything back.  You know, we'll give

12   you absolutely everything back."  Well, then we have to make

13   motions for bills of particulars in terms of what's relevant.

14            But for -- I say fortunately -- maybe unfortunate

15   for their argument -- it gets to the second issue, which is

16   but that doesn't help the other Defendants who are entitled

17   only to material that was seized.

18            And so we -- we really have two reasons why this has

19   to be done this way, you know.  One solution could be okay,

20   we've now looked at everything.  We've taken the contraband

21   out, and we'll give you back everything else, and that happens

22   in the child pornography cases.

23            In this case, there -- there presumably has been no

24   claim of contraband, but returning the item would -- would be

25   beneficial for each Defendant, but it certainly wouldn't solve

1   the second problem.

2           **THE COURT:**  Right.  I take it your point is that,

3   for example, Mr. Covelli is entitled to information seized

4   from Ms. Valenzuela --

5           **MR. NOLAN:**  Absolutely.

6           **THE COURT:**  -- upon which --

7           **MR. NOLAN:**  Absolutely.

8           **THE COURT:**  -- the Government is relying?

9           **MR. NOLAN:**  Oh, yeah.  And -- and we've cited on

10  that, and there -- there's no doubt about that.  I mean, this

11  is evidence that they may intend to use at trial that we need

12  to know about, we need to examine.  It's -- it's Rule 16.

13  It's clear material.

14          So -- and it's not up to the Defendants to make that

15  decision.  It's up to the Government.  In other words, the

16  Defendants can't make that decision.  They can't say "Well,

17  we'll give you in.  We won't give you that."

18          I mean, that -- that -- that -- my duty and my

19  responsibility -- I mean, the Government's duty can't be

20  transferred to the Defendants so --

21          **THE COURT:**  To say nothing of the cost.

22          **MR. NOLAN:**  Well, that -- that is -- that is -- that

23  really goes to the crux, in my opinion, of the problem.  And

24  that is, you know, eventually we're going to have -- we're

25  going to have debates about the costs of this kind of

1   prosecution, this kind of discovery mechanism, this kind of

2   problem associated with seizing items.

3          Now, where -- where should -- where should that

4   burden be shown?  Are -- are we going to end up with having

5   the Defendants pay for it, at which point Congress is going to

6   say "Well, what is this situation?  You know, Sixth Amendment

7   right to counsel, but look at how much it cost."

8          Well, no, it shouldn't be -- it shouldn't be

9   attributed to the accused, the -- the cost.  It should be the

10  Government -- I mean, the -- the Justice Departments.  It's

11  all Justice Department, but it should be from the prosecution

12  because it's a cost of prosecution.  There's a cost associated

13  with that type of seizure, using that type of warrant, you

14  know.

15         And -- and we're just now getting into -- it's easy

16  to say "Okay, let's go in and take the whole warrant -- I

17  mean, take the whole hard drive.  It's easy to say.  It's

18  convenient.  We don't want to sit there," etcetera, but

19  there's a price.  And now, in this particular case, we're

20  seeing that price.

21         And -- and I think that -- that unfortunately, you

22  know, we're trying -- we are -- the Defendants are trying to

23  make sure that that price isn't so great as to deprive our

24  client of a Sixth Amendment right to counsel, which we need.

25  And so it's just that a new procedure I think the Government

1   has to get used to doing in a case like this.

2          THE COURT:  So I take it that the Defendants are

3   asking this Court for an order compelling the Government to

4   segregate that data and make it available to Mr. Aoki within a

5   certain number of days?

6          MR. NOLAN:  That's exactly right.  And just so it's

7   clear, I -- I want to be able to access and copy all relevant

8   materials seized by the Government pursuant to the searches of

9   each and every one of the hard drives that -- that -- in this

10  case, and -- and -- and I want that because I'm entitled to

11  it.  I do not want material that is irrelevant --

12         THE COURT:  Irrelevant.

13         MR. NOLAN:  -- maybe protected by privileges that

14  the individual has.  I -- I don't want irrelevant material.

15         THE COURT:  Nor do you wish to have the burden or

16  expense of identifying irrelevant material as to your client?

17         MR. NOLAN:  And -- and -- and, of course, I can't

18  make that determination as to my own client, determining

19  irrelevant material.  You know, I -- I mean, might be able to

20  guess, but I'd hate -- I'd hate to choose this is irrelevant

21  and find out oh, they think it's relevant for some particular

22  reason.

23         And -- and -- and I -- I -- I don't want anybody

24  having my client's irrelevant material provided to them, nor

25  do I believe that -- that they should be entitled to it.

1        After I look at what is seized and what they keep

2  and what they claim is relevant, then I can make further

3  motions, beyond the scope of the warrant, you know.  I can

4  make all of those appropriate motions, but at the present time

5  it's their duty to -- to segregate it out so that I can ask

6  that Mr. Aoki be provided with the relevant portions of -- and

7  material portions pursuant to Rule 16 of the items seized from

8  the searches conducted in this case from all of the

9  Codefendants in this case.  He then can make it available to

10 all counsel who are entitled to that information.

11       **THE COURT:**  One -- one further question for you, Mr.

12 Nolan.  Is it accurate for me to understand as we sit here

13 today, Mr. Aoki has copies of the data -- all of the data that

14 has been seized on those devices?

15       **MR. NOLAN:**  Number one, I believe Mr. Aoki, first of

16 all, has data from two servers.  He got that early on.  Those

17 servers, everything presumably is relevant or -- and we all

18 have access, or are gaining access to that through the

19 services of the -- of the different vendors.

20       As to the individual drives, I believe he's been

21 sent individual drives of individual Defendants, and each

22 Defendants' attorney has notified most of them -- I can't each

23 and every one -- that they authorize -- that they do not

24 authorize that any material from that computer drive be

25 submitted -- be allowed to be obtained from any other

1   Defendant because they don't know, you know, what is and what

2   is not -- belongs to them, etcetera.

3          So -- now, there is -- there is a -- there is a

4   problem that we can address later, and that is I just got my

5   drive and it's in EnCase form, which is interesting because if

6   you look at the new guidelines that they're talking about AO -

7   - you know, the problem is EnCase is really a Government

8   program.  It's very, very difficult to buy.  It's very, very

9   difficult to run.

10         And when the Government takes the information from

11  the drive that -- that presumably I could put into a computer

12  and if I knew how to operate it, I can, you know, get the

13  information.  They put it in EnCase for investigative purposes

14  and for, you know, analysis, etcetera, and then they give it

15  to me.  It's really -- it's really useless.  So I mean, that's

16  a separate issue.

17         **THE COURT:**  Unless you, of course, take out an

18  EnCase license.

19         **MR. NOLAN:**  Unless I take out an EnCase license, and

20  last time -- every time I talk about that, you know, I see the

21  cost.  I see the price, but -- and you also have to learn how

22  to use it.

23         The point being is is that they can't take the data,

24  change the nature of the data, and then give it back to me in

25  an unusual -- in a form that makes it near impossible for me

1    to use, but that's a separate -- that's a separate kind of

2    issue.

3            So right now I have a hard drive.  Mr. Aoki provided

4    it to me, presumably of Mr. Covelli's computer, and that hard

5    drive is in EnCase, and I now have to figure out how to learn

6    that.

7            But I simply do not have the information from the

8    other Defendants' hard drives, much of which must be relevant

9    because the Government is, in fact, possessing it right now,

10   and I need to know what that is and I need to be able to

11   access it.

12           **THE COURT:**  All right.

13           **MR. NOLAN:**  I -- I -- I think it -- I think it's --

14   it's -- I think it's pretty clear.  I mean, I'm happy to kind

15   of answer your questions, but the -- the case law seems to

16   support this.  Practical implications are that this should

17   have happened.

18           And I have no way of figuring out how Mr. Aoki can -

19   - can devise a way to take my client's hard drive, separate

20   out that which is -- he thinks is relevant, and then give it

21   to Codefendants.

22           And I certainly wouldn't be agreeing to anything

23   because I don't want to be part of that, you know.  I want to

24   be able to claim that it wasn't properly done too.

25           **THE COURT:**  All right.  I think I understand your

1   position, and I understand your interest.

2           Let's hear from the Government on this.  Mr.

3   Parrella or Mr. Chew, who is going to speak, please?

4           **MR. PARRELLA:**  I will, Your Honor.  First of all,

5   let -- let's talk about the -- the issue of segregation.  We

6   provided to Mr. Aoki images of every hard drive and computer

7   tower or laptop that was seized from these charged Defendants.

8   Okay.

9           **THE COURT:**  Complete images?

10          **MR. PARRELLA:**  Yes.  Total complete images.  He had

11  -- he has them now.  We had an agreement that the Defense

12  would segregate them in terms of sharing them with each other

13  because the Defense would know what information they

14  considered to be personal.

15          **THE COURT:**  Is this agreement memorialized in any --

16          **MR. PARRELLA:**  No.  No.  This is -- you can see from

17  the emails that were attached to our response that was the

18  operating theory.  Individual Defendants were going to review

19  the -- the -- these hard drives.

20          That has now changed.  They have reversed course on

21  that.  I understand that providing information to each

22  Defendant is the Government's responsibility.  We actually

23  have done that.  If the Court instructs us that we have to --

24  so -- so we've actually completed it.  I mean, we -- we have

25  turned over all the evidence seized from these Defendants to a

1   defense discovery repository.

2          **THE COURT:**  But you haven't complied with attachment

3   C; is that fair?

4          **MR. PARRELLA:**  Well -- well, we have.

5          **THE COURT:**  How?

6          **MR. PARRELLA:**  Attachment C allows us, if we find

7   evidence on a hard drive, to keep the entire hard drive in

8   order to establish the authenticity of the hard drive, the

9   completeness of the evidence.

10         **THE COURT:**  Attachment C doesn't speak to

11   authenticity of completeness, does it?  I didn't see those

12   words anywhere in there.

13         **MR. PARRELLA:**  Our attachment C?  Yes, that's --

14   that's --

15         **THE COURT:**  Where?  Maybe I'm missing it.  Where

16   does it say that?

17         **MR. PARRELLA:**  Well, I -- I -- I don't have it in

18   front of me actually, Your Honor, so --

19         **THE COURT:**  All right.

20         **MR. PARRELLA:**  And -- and that's where we're --

21   we're coming from.  It's only in circumstances where there is

22   segregatable (sic) or it's on a separate hard drive that we

23   would have to then return that hard drive.

24         **THE COURT:**  So your view is that the segregation

25   obligation under the Protocol -- Protocol that was drafted, I

1    believe, by the way, with the cooperation of your office --

2         **MR. PARRELLA:**  Yeah.  I --

3         **THE COURT:**  -- obligates the Government to segregate

4    information only on a drive-by drive basis and not a file or

5    directory-or-directory basis?

6         **MR. PARRELLA:**  That -- that's -- that's correct,

7    because in order to -- in order to establish the -- the

8    authenticity of the drives and the authenticity of the

9    evidence, we need to keep the original item that was seized.

10        Now, if there's nothing of evidence in a drive, then

11   we don't need to keep that and that can be returned.

12        **THE COURT:**  So your view is if there was even a

13   single byte of relevant data on a multi-terabyte server or

14   drive, you'd be entitled to keep the entire drive under this

15   Protocol and attachment based on your need to authenticate

16   that byte later at trial?

17        **MR. PARRELLA:**  That's right.  That is exactly right.

18   I -- I -- this Protocol was created -- in fact, I wrote it and

19   submitted to Judge Spero, and so it was created by cooperation

20   with my office.

21        If you look at paragraph 9, it says, "For the

22   purposes of this search Protocol, the phrase to preserve

23   evidence is meant to encompass reasonable measures to ensure

24   the integrity of information responsive to the warrant and the

25   methods used to locate the same."

1          Now, I didn't -- I apologize for not using the same

2    language, but I didn't have it in front of me when -- when I

3    argued about authenticity, but that's what I was referring to.

4          **THE COURT:**  But of course, the only use of that

5    phrase is in paragraph 1, right?  That's what it's defining,

6    isn't it?

7          **MR. PARRELLA:**  "To preserve evidence," I think, is

8    used in more than one paragraph, but in any case that is --

9    that is the -- the thrust of -- of -- of that paragraph.

10          So if the Court is saying that we need to segregate

11    out personal data from the hard drives of each Defendant, I --

12    I can understand that -- that concept, and I understood it

13    from the Defense.  That's why we offered to let them do it.  I

14    -- I -- I understand it's --

15          **THE COURT:**  No, but the issue is who has the burden

16    of doing that, right?

17          **MR. PARRELLA:**  That's correct.  And my --

18          **THE COURT:**  Hasn't Judge Jensen made it clear what

19    he thinks about this subject?

20          **MR. PARRELLA:**  Well, my only -- my only point in

21    bringing this up is that this is not an issue that's contained

22    within the Protocol.

23          I think the -- I was not present during the argument

24    with Judge Jensen.  I think it was -- from my review of the

25    transcript, it was brought up in a -- in a very brief manner.

1  It wasn't completely fleshed out.  There were other issues in

2  terms of issues of return involved in that that were, quite

3  frankly, not fleshed out.

4          And while we agree that if we have to segregate it,

5  the Government can do that.  It is possible for us to do.  My

6  only point is that the -- the -- the Protocol doesn't require

7  that.

8          Imagine we only had charged one person.  We would

9  have provided the complete hard drive back to them, and we

10  would be in total compliance with the Protocol.  We wouldn't

11  need to segregate that Protocol, if we had items of evidence

12  contained within -- within the seized hard drives.

13          **THE COURT:**  But -- but with all due respect,

14  counsel, you didn't charge just one Defendant, right?  You

15  charged --

16          **MR. PARRELLA:**  Right.

17          **THE COURT:**  -- more than a dozen.  So when you

18  present this Protocol to colleagues in this district and

19  elsewhere, it seems to me they are -- it's pretty clear

20  they're relying upon the representation that there's going to

21  be some effort -- reasonable effort, perhaps nothing more,

22  nothing less -- to identify the stuff you're entitled to.

23          We all agree you're entitled to certain things under

24  this warrant, but you got to give the other stuff back, or at

25  a minimum you got to make it available in discovery so that

1    each Defendant can understand what evidence might be used

2    against them.

3              Isn't that pretty clear on the face of the Protocol?

4         **MR. PARRELLA:**  Well, we -- we did make it available.

5    We gave them copies of it.

6         **THE COURT:**  But how are they to sift through all of

7    this data when it's clear there is at least some data -- I

8    suspect there's a lot of data that has nothing to do this case

9    on each one of those hard drives.

10        **MR. PARRELLA:**  Well, they would sift through it the

11   way you sift through anything.

12             In a wiretap case we have a thousand hours of

13   conversations.  We may only have two hours that are relevant

14   to the investigation, but we turn over a thousand hours of

15   investigation.  And -- and they listen to the thousand hours,

16   and they come to a conclusion as to what's relevant or not.

17        **THE COURT:**  So your -- your -- your -- your view and

18   your office's view is that under *Brady* and all the Ninth

19   circuit precedent that fall from it, the cost of sifting

20   through all that data falls squarely on the Defendants?  The

21   Government bears no responsibility for that?

22        **MR. PARRELLA:**  I -- I think it's actually a good

23   point that you bring up, Your Honor, about *Brady* because there

24   are many things -- if we segregate it out and we don't return

25   to them the full and complete copy, later we could be accused

1  -- if there's something that is found to be potentially *Giglio*

2  material or potentially *Brady* material, we'd -- we'd be

3  accused of violating *Brady*.  And in -- in fact, what we're

4  trying to do is follow a Court's order to segregate relevant

5  material.

6         That's why we'd rather produce the whole thing.

7  That way it can't said that there's a *Brady* violation or a

8  *Giglio* violation.  Somewhere in a unrelated file there may be

9  something that the individual later argues is *Brady*, but if

10  we've turned it over, obviously, it's not *Brady* because it's

11  been disclosed.  So -- so that is an issue.

12         There's no way around it that in -- in this type of

13  case, yes, Defense has to bear the burden of analyzing some of

14  this stuff, and looking at some of it and seeing what's

15  relevant and making a decision on their own.

16         **THE COURT:**  Are you aware of any circuit or even

17  district court that's ever addressed the issue of the

18  Government's obligation to segregate data in a multi-Defendant

19  case like this?

20         **MR. PARRELLA:**  No, I'm not.  And I -- I'm not aware

21  of any decision that either says it's the Government's

22  responsibility or it's the Defendants' responsibility or a

23  third option, it's the Government's responsibility to turn

24  everything over to everyone.

25         We actually originally entered into this, not from

1    the standpoint of really discovery, but from a response to a

2    request by the Defense to remove personal identifying

3    information from each drive, and -- and that -- so that is why

4    we said, "Well, you would know that better than we do, so why

5    don't you do it?  And that, obviously, has not worked now.

6         So it -- it can be accomplished, and I do agree

7    we're probably in a better position to do that, the Government

8    is, and we can do that, but I -- I'm spending all this time

9    arguing for a couple of reasons.

10         One, because I don't believe that the Protocol

11   itself mandates that.  And number two, we're concerned that if

12   we do this that somehow we're -- we're going to get

13   boomeranged by trying to follow the Court's order, then later

14   we expose ourselves to a *Brady* charge or later we expose

15   ourselves to an incomplete discovery charge, if, for example,

16   the Defense raises a Defense that is responded to in some way

17   by information that wasn't turned over.

18         So -- but with those caveats, I mean, I think we can

19   move forward.  I -- I see where the Court is going.  I -- I --

20   I understand --

21         **THE COURT:**  I'm glad you do.  I don't, but I have a

22   lot of questions around these issues.  It seems to me that I'm

23   staring a bunch of search warrants that pretty clearly

24   suggested to the Magistrate Judge signing it that within a

25   reasonable period of time -- 60 days is the default, some --

1   maybe it's another two months after that -- at some point the

2   Defendants would have access to the stuff that say justify the

3   warrant.

4         And the other stuff that's not -- that lies outside

5   the scope of that warrant ought to be returned, ought to be

6   shielded from view by other Defendants who have no right to

7   it.  It seems --

8         **MR. PARRELLA:**  Well --

9         **THE COURT:**  -- fairly straightforward.

10        **MR. PARRELLA:**  -- a couple things.  Number one, the

11  information was made available to them.  I mean, they -- each

12  Defendant has access to their own hard drives that Mr. Aoki

13  has.  So if it's talking about, as Mr. Nolan was talking

14  about, the information being separate from the actual machine,

15  they have access to that.

16        So if they had financial information that they

17  needed on that machine or, you know, tax information or

18  personal information, they could go and access that.  That is

19  in compliance with the -- with the -- the Protocol, so -- so

20  that is satisfied.

21        The Protocol specifically talks about if the

22  Government is otherwise prevented by law to retain the items,

23  and these are items that the Government alleges -- these

24  machines, these hard drives, the originals, were utilized to

25  plan the DDOS attack and effectuate the DDOS attack so --

1    **THE COURT:**  So on that issue, Mr. Parrella, is it

2  the Government's representation that each and every one of

3  these hundred-plus data storage units, hard drives, etcetera,

4  is an instrumentality?

5    **MR. PARRELLA:**  I believe so.  As I stand here, I

6  don't have a list in front of me, but I believe that is the --

7    **THE COURT:**  Would you agree that if --

8    **MR. PARRELLA:**  (Inaudible - - due to simultaneous

9  colloquy.)

10    **THE COURT:**  -- one or more of these devices or -- or

11  storage units was not an instrumentality, there would be no

12  question you'd have to return them under the terms of the

13  Protocol itself?

14    **MR. PARRELLA:**  Well, it depends because if -- even

15  if it were not an instrumentality -- in other words, let's say

16  there was a separate hard drive that wasn't used to plan the

17  attacks, to communicate about the attacks or to effectuate the

18  attacks, but it was used to store logs of the attacks or to

19  store IRC chat about it, then that circumstance I would have

20  an issue that it is not returnable, even though it's not an

21  instrumentality.  We would be able to retain that in order to

22  -- to establish the authenticity of the -- of that item.

23  However --

24    **THE COURT:**  Is -- is your authenticity argument

25  predicated on -- on a -- on a requirement that you have no

1    other way to authenticate the data other than to complete a

2    clean image and keep the original hardware?

3            Is that the standard I ought to be thinking about,

4    or is it simply that it's more convenient for the Government

5    to have the whole thing, and as long as it facilitates your

6    opportunity to authenticate that's a sufficient basis?

7            **MR. PARRELLA:**  Well, I -- I don't know that I would

8    agree with either of those characterizations because it's not

9    that there's no other way.  You know, we -- we -- there are

10   other ways.

11           **THE COURT:**  Agents can come and agents can testify?

12           **MR. PARRELLA:**  That's right.

13           **THE COURT:**  Right.

14           **MR. PARRELLA:**  But to us, we should be entitled to

15   prove our case in the way that we deem is best.  This is the

16   best evidence.  We don't know now.  We don't -- we certainly

17   don't have any stipulations from the Defense to the

18   authenticity or the completeness of both the actual evidence

19   or of the search and the imaging procedures.  In fact, Mr.

20   Nolan seemed to indicate that they were going to make motions

21   on that.

22           The best way to do that that I know of and I've only

23   been -- and -- is to bring in, if it really gets down to it --

24   "This is the computer that we seized from Defendant X," and we

25   can actually, you know, boot it up, put it on the screen.  You

1  could see the logs right on that computer.  That's the best

2  way to do it.

3       We shouldn't be restricted in that because, again,

4  we're in a circumstance if we -- if we don't have that, then

5  what prevents the Defense from saying, "Hey, guess what?  They

6  made a poor image.  This image is corrupted."

7       I guess if every Defendant stipulated, maybe we'd

8  have a slightly different argument, but that's the landscape

9  where we are right now.

10       So I don't want to belabor this, but I have to check

11  on Mr. Nolan's statement about whether the items are in EnCase

12  or not because I know we communicated -- and by "we," I mean

13  the actual agents who were transferring it -- specifically

14  with Mr. Aoki to make sure he could access these things in a

15  way that was satisfactory to him.  Just to be clear, we're not

16  providing these hard drives to the Defense attorneys.

17       **THE COURT:**  There's a -- there's a CDA in between

18  you.

19       **MR. PARRELLA:**  Right.

20       **THE COURT:**  I understand.

21       **MR. PARRELLA:**  So I don't know what he's doing with

22  them.  I -- I do know there is an issue that we've been

23  working with Mr. Aoki where I think, perhaps, the way Mr. Aoki

24  is imaging these hard drives is causing some difficulty, but I

25  -- I don't know that as I stand here for sure.

1      **THE COURT:**  All right.  Thank you, Mr. Parrella.

2      **MR. PARRELLA:**  So thank you.

3      **THE COURT:**  Mr. Nolan or anyone else want to offer a

4  brief rebuttal?

5      **MR. LEEMING:**  Peter -- Your Honor, Peter Leeming for

6  Mr. Collins.

7      There's been a suggestion at the hearing before

8  Judge Jensen that resulted in the comments that have been

9  quoted were some kind of an afterthought.  That's not true.

10     There was -- I had conversations with Mr. Aoki.

11 This issue became apparent early that it was going to be

12 problem, and Judge Jensen made what I perceived to be an order

13 returning property and ordering the Government to segregate

14 out relevant data.

15     There's really two issues that I think the

16 Government is bringing up here.  One is the issue of

17 authenticity.  That is separate from identifying the data that

18 needs to be used to prosecute this conspiracy case.

19     This isn't a situation where everybody is charged

20 individually.  This is a situation where conceivably other

21 Defendants' information can be used against my client's, but

22 we've had privacy concerns raised by everybody that they don't

23 want the entire contents of their hard drive shared with

24 everybody.  So I mean, that's one.

25     Second is the volume of the data is tremendous.

1   It's huge.

2         So I do think that it's incumbent upon the Defendant

3   to identify what it is they think is pertinent to this case.

4   I think the authenticity issue is kind of a red herring.  I

5   think it can be addressed other ways, and that's my comment.

6         **THE COURT:**  All right.

7         **MR. LEEMING:**  Thank you.

8         **THE COURT:**  All right.  Thank you, Mr. Leeming.  Mr.

9   Nolan.

10        **MR. NOLAN:**  Just very briefly.  Counsel never did

11  address your questions, in my opinion, on the issue of what

12  about the multi-Defendant aspect of this.

13        And I think it would be -- you know, you can look at

14  it separately.  If it was single Defendant, take the computer.

15  I'd be in Court saying "Return to me the items."  We'd go

16  through that whole issue, and I'd say, "Well, wait a second.

17  I need -- are you going to require me to suppress my

18  photographs of family?"

19        "No."

20        "Are you going to -- am I going to have to come into

21  court on that or don't you have a duty pursuant to your

22  representation to the -- to the Magistrate?"

23        I mean, these rules have only started to be -- be

24  worked on in the last, you know, five or ten years.  The idea

25  of -- you know, and in terms of go in, take a huge amount of

1    material because it's easy.  It's there.  It's stored.

2         And then -- then sit on it basically, and then

3    basically say "Well, we'll find what we want to find.  We'll

4    put it in -- we'll analyze it, but we don't have any duty to

5    kind of go back and return what we shouldn't have taken in the

6    first place, what we're not entitled to take in the first

7    place.  And the only reason we're entitled to take it is

8    because the Magistrate said as a practical matter we'll let

9    you take things you're not otherwise entitled to because

10   you're going to return it, because you're going to do the due

11   diligence outside of that person's house rather than inside

12   that house."

13        That's the thing that seems to be lacking in the

14   first argument.

15        The second argument is we made no agreement

16   regarding how these things would be handled.  We basically

17   told Mr. Aoki, most of us, I think all of us said, "Hey, I

18   appreciate you getting our hard drive so we can take a look at

19   it, but I'll be -- I don't want you to give this to somebody

20   else."  I said, "They're not entitled to it."

21        And I don't want to disseminate something which may

22   have been -- should maybe be suppressed because then I'm

23   waiving that.  You know, I -- I'm giving up that information.

24   I can't do that and --

25        **THE COURT:**  Mr. Nolan, if the Government takes on

1  this burden, and it's a burden I believe under your argument

2  they take on.  I'm not saying how I see this yet.

3        But if the Government were to take this burden on

4  and make a mistake, right, and to, for example, allow access

5  to your client's personal medical history or issues regarding,

6  you know, family tax planning, things of that nature.

7        **MR. NOLAN:**  Right.

8        **THE COURT:**  What remedy would there be?  What relief

9  would the -- would -- would -- would you be entitled to under

10  that situation where you're -- you are for -- you are telling

11  the Government you want them to do this, and yet when they

12  make a mistake who bears the burden of that mistake?  That's

13  what I'm trying to get at.

14        **MR. NOLAN:**  Yeah.  I guess I don't look at it as I'm

15  telling the Government what I want them to do.  I'm telling

16  the Government what I think they have to do.

17        **THE COURT:**  You're asserting --

18        **MR. NOLAN:**  Yeah, I'm asserting my right --

19        **THE COURT:**  -- what you believe are your client's

20  right.

21        **MR. NOLAN:**  -- to have them do that.

22        **THE COURT:**  Yeah.  Sure.

23        **MR. NOLAN:**  And quite frankly, it is their duty to

24  do well because they are taking material that is completely

25  irrelevant that the Magistrate Judge would not have allowed

1    them to take that otherwise they would have had a special

2    master so we could have claimed attorney-client privilege or

3    some other kind of privilege on the materials, and it is their

4    duty to do that.

5              And -- and I think that the way -- I mean, who

6    knows.  If -- if they're worried about something in the call

7    they're making on a particular thing, you know, maybe

8    protective orders are a way to -- to work on that so that --

9    so we all have to sign kind of protective order so that the

10   taint doesn't get dissipated unnecessarily, you know.  So it

11   doesn't become an automatic we can't stop the taint because

12   we've released it to the -- the discovery master, something

13   like that.  I mean, those -- those possibilities might be able

14   to be worked out.

15             **THE COURT:**  I take it that you're -- you're of the

16   view that in urging or asserting this right that you believe

17   your client has, you're not in any way waiving your further

18   right to challenge the Government under *Brady* or otherwise

19   down the road, right?

20             **MR. NOLAN:**  No.  I am not waiving anything.  And by

21   the way, we did not agree to anything that counsel said in

22   terms of there was no agreement.

23             But no, I'm not waiving anything because I still am

24   allowed to go in and move to suppress, move to -- move to

25   suppress, move to -- move to make whatever motions are

1   appropriate, but I'm entitled to this.  In other words, this

2   is -- you know, it isn't -- it isn't like oh, if I get this

3   then I give something else.  You know, I can't do that.

4           THE COURT:  All right.

5           MR. NOLAN:  All right.

6           THE COURT:  I think I understand your views.

7           MR. NOLAN:  Thank you.

8           THE COURT:  All right.

9           MR. NOLAN:  All right.

10          MR. COHEN:  Judge, could I just add one very --

11          THE COURT:  Sure, you can, Mr. Cohen.  Go ahead.

12          MR. COHEN:  I just thought -- and I'm not suggesting

13  that the Government is being disingenuous with this, but I

14  found it interesting that in comparison to a wiretap case

15  where they have thousands of hours of wires and they choose to

16  use two calls.

17          Well, there's an old foundation to this

18  "minimization."  The thousands of hours that they have should

19  have and, indeed, must pass the minimization requirements in

20  the first instance, leaving the Government with a thousand

21  hours of relevant probative information, which allows them to

22  pick five minutes.

23          We don't have minimization here.  We have the vacuum

24  cleaner at work.  They came in.  They took everything.  Some

25  of it's relevant, most of it is not.  And it's a difficult

1    concept and it's evolving, but let's -- let's apply the

2    concept of minimization after the fact, and I think that's

3    what Judge Jensen was speaking to when he discussed the

4    matter.

5        **THE COURT:**  All right.  Thank you.  Motion to submit

6    it.  I will issue an order very shortly on this subject after

7    the hearing.

8        Let's turn to some of the other issues that remain

9    on our agenda.  I'd next like to talk about the Pretrial

10   Service proposal for modification of the -- what I'll call the

11   inspection requirement.

12       I believe this is captured Ms. Valenzuela's

13   objection at docket 191.  I know there, again, were a number

14   of joinders filed, but I'd like to hear from the Defendants,

15   their arguments.  Mr. Whelan, I suspect --

16       **MR. WHELAN:**  Your Honor, if I could suggest --

17       **THE COURT:**  -- you're in a good position to address

18   this, so why don't you go ahead.

19       **MR. WHELAN:**  -- we've tentatively agreed on kind of

20   a tiering of how to deal with this -- this issue.

21       **THE COURT:**  All right.

22       **MR. WHELAN:**  And we tentatively agreed that I would

23   go first on behalf of Mr. Cooper --

24       **THE COURT:**  All right.

25       **MR. WHELAN:**  -- because it was Mr. Cooper's bail

1   violation notice in December -- December 20, 2012 that got

2   this issue rolling, if I may?

3        **THE COURT:**  I'll just note for the record that I

4   believe that Mr. Cooper's response is at docket 202.  Why

5   don't you go ahead.

6        **MR. WHELAN:**  And that is correct.  And in essence,

7   as I said in my moving papers, Mr. Cooper's issue essentially

8   has been settled.

9        Pretrial Services in Mobile, Alabama, the Southern

10  District of Alabama has scanning software that they received

11  from an USDOJ Law Enforcement Forensics Unit that's loaded

12  with free software that -- and training is provided by US --

13  this USDOJ Center.

14       The Pretrial Services officer came to Mr. Cooper's

15  house, inserted the thumb drive into his USB port, ran the

16  scan.  It took about an hour and a half.  The first scan takes

17  a long time.

18       Mr. Robbins, the Pretrial Services officer, has

19  educated me a little bit since the last court date.  I've

20  spoken with Mr. Carranza about that.  And, you know, the next

21  scan that occurs is expected to take ten or 15 minutes because

22  it only dates back to the first scan, which takes a long time.

23       **THE COURT:**  It's looking at the incremental change

24  in the history?

25       **MR. WHELAN:**  Exactly.

1        **THE COURT:**  Right.

2        **MR. WHELAN:**  That initial scan retained a log of the

3  deleted files that Pretrial can look at, the Government can

4  look at.  My client on his computer also has a log of those.

5  He's sent it to me.  I've offered it to the Government.  So

6  Pretrial in Alabama continues to have that software and

7  continues to be able to monitor Mr. Cooper's compliance.

8        And so it's my understanding through discussions

9  with -- with Mr. Carranza that specifically as to Mr. Cooper

10  and this issue, it's -- not an issue anymore.

11        The only additional thing that the Government and I

12  talked about is inserting into condition 4 of his Pretrial

13  release condition that he shall "not" then insert

14  "intentionally delete internet history," etcetera.  Having

15  said that, I think Mr. Cooper's issue is resolved.

16        The larger issue of whether other Pretrial Services

17  offices, you know, should be --

18        **THE COURT:**  Not Mr. Cooper's problem, I understand.

19        **MR. WHELAN:**  -- doing the same thing.  I'm

20  certainly, you know, presented that as an option, and -- but

21  I'm not -- yeah, I don't think that issue is involved.

22  Pretrial is still investigating it and trying out software,

23  and maybe Mr. Carranza can make --

24        **THE COURT:**  All right.  Well --

25        **MR. WHELAN:**  Yeah, if we could --

1        **THE COURT:**  I want to hear from Pretrial, of course

2   --

3        **MR. WHELAN:**  Yeah.

4        **THE COURT:**  -- and the Government as well on this

5   issue.

6        Are there any -- as to Mr. Cooper and as to this --

7   I'll call it suggestion that all of the districts rely upon

8   this thumb drive with the scanning software -- does any -- do

9   you wish to add any further -- does anybody else want -- wish

10  to speak on that subject because I think I understand what

11  you're saying pretty clearly?

12       **MR. WHELAN:**  I -- I think there is general --

13  there's -- there's more issues on the global monitoring issue

14  that other Defense lawyers may want to be heard on this

15  scanning issue.

16       I know there's -- there's unanimous opposition to

17  inserting software on to the client's computer and having the

18  Defendant pay a monthly fee to have a third party agency

19  monitor his computer use.  I -- I -- we will all object to

20  that, and that's not necessary for my client because Pretrial

21  already has the ability in Mobile to do what's necessary.

22       I would ask the Court, after hearing from the

23  Government and Pretrial, to deem Mr. Cooper's issue settled

24  with the addition of the word "intentionally" into condition -

25  - sentence one of condition 4.

1          **THE COURT:**  All right.  Thank you, Mr. Whelan.  Mr.

2    Leeming?

3          **MR. LEEMING:**  Yeah, just quickly, Your Honor.  Peter

4    Leeming for Mr. Collins.

5          The -- the problem that Mr. Collins faces, and is

6    also a separate violation for him, is that he refused to sign

7    a computer restriction and monitoring program participant

8    agreement, which is used in the district where he lives.

9    Apparently, they do not use anything else other than to

10   install intrusive monitoring software on computers.

11         **THE COURT:**  Mr. Collins is in the Northern District

12   of Ohio; is that correct?

13         **MR. LEEMING:**  I believe so.

14         **THE COURT:**  All right.  Is that correct?

15         **MR. CARRANZA:**  Correct.

16         **MR. LEEMING:**  Yes.  And so I have a copy of that

17   here.  It's a very intrusive agreement, and that is what he

18   did not sign.  I think there is a need for uniformity as --

19         **MR. CARRANZA:**  Oh, thank you, Your Honor.

20         **MR. LEEMING:**  -- best as we can do in these

21   situations.

22         **THE COURT:**  Well, I'm sure that you would agree, Mr.

23   Leeming, my challenge is on the one hand I'm being encouraged

24   to consider uniformity.  On the other hand, my Circuit and

25   others have directed me to consider each individual

1   Defendant's situation specifically, so there's a bit of a

2   tension between those two positions.

3           **MR. LEEMING:**  I understand that.

4           **THE COURT:**  So except, I suppose, if I were to raise

5   to the bottom and adopt the one condition that any district

6   could apply across the board, even if there were other

7   districts that were able to take a more surgical approach to

8   this.  But I understand your view.  That's -- you're -- you're

9   speaking on behalf of Mr. Collins.  All right.

10          So what I've been handed then is a -- is an

11  agreement, which is a requirement of the Northern District of

12  Ohio?

13          **MR. LEEMING:**  That's my understanding, Your Honor,

14  yes.

15          **THE COURT:**  All right.  Do you wish to add anything

16  further, Mr. Leeming?

17          **MR. LEEMING:**  No, except that we object to it and

18  it's -- it would --

19          **THE COURT:**  I take that from your remarks, yeah.

20          **MR. LEEMING:**  I -- my view is when I saw this, it

21  was inconsistent with the initial order that Your Honor made.

22  It was inconsistent with other agreements that people were

23  reaching with their individual Pretrial Services, and I don't

24  think it's appropriate here.

25          **THE COURT:**  All right.  Thank you, sir.  Mr. Cohen?

1     **MR. COHEN:**  If I may?  And I'm speaking, I think, on

2  behalf of all of the Codefendants, as well as those who are

3  not here today.

4         And I've had some discussions with the Government,

5  and we think the Government's request -- heaven forbid I be

6  accused of saying the Government is being reasonable -- but I

7  think the Government's request that we provide Pretrial

8  Services with an opportunity to examine and to explore whether

9  this thumb drive attachment system will resolve this is

10  reasonable.

11        I've spoken to the Pretrial people in Vegas, and

12  although it's not a system that they use or have, when I

13  explained to them or spoke to them on the basis of what co-

14  counsel told me this system was about, they didn't seem to be

15  terribly upset by it.  It seems to be simple enough and it

16  seems to be available.

17        So I think our position is with regard to this thumb

18  drive system is we would respectfully request that Your Honor

19  grant and join in with the Government's position -- Pretrial

20  Service a reasonable opportunity to see if it will work and

21  how so, see if there are any additional problems, and in the

22  interim maintain the status quo ante.

23        And it seems to me with the insertion of

24  "intentional," which we all agree on, in the interim that's

25  something we can live with now on behalf of all of the

1  Defendants.  That sort of, I think, give all the sides that we

2  need at this point.

3       **THE COURT:**  All right.  Unless anyone else from the

4  Defense wishes to address this issue, I'd like to hear from

5  Mr. Parrella and, of course, Pretrial as well.

6       Mr. Parrella, why don't you go first.

7       **MR. PARRELLA:**  So I wanted to bask in Mr. Cohen's --

8       **THE COURT:**  Reflective glow?

9       **MR. PARRELLA:**  -- acknowledgment of -- that I'm

10  reasonable.  But first of all, on the issue of inserting the

11  word "intentional," we don't have any problem with that.  That

12  --

13       **THE COURT:**  All right.

14       **MR. PARRELLA:**  That's fine by us.

15       **THE COURT:**  Well, since we're all in agreement on

16  that one, let me just note on the record I'm going to grant

17  that joint request, as I style it, and ask that a modification

18  be drafted that I can sign, which adds the word "intentional"

19  to the condition 1 in each of the release orders, so let's --

20  let's go forward.

21       **MR. PARRELLA:**  Okay.

22       **MR. COHEN:**  It's condition 4.

23       **THE COURT:**  It's condition 4.  Thank you.

24       **MR. PARRELLA:**  Thank you, Your Honor.

25       **THE COURT:**  I apologize.

1      **MR. PARRELLA:**  I -- I have two other comments, one

2   on the technological fix suggested.  And the Government --

3   assuming that this thumb drive does what it is -- claims that

4   it will do, which is to identify deletions and scan it,

5   assuming that it does that in the manner in which it's

6   advertised, we really don't have any objection to that, I

7   think, as far as this district.

8           Your Honor ordering other --

9      **THE COURT:**  There's an issue --

10      **MR. PARRELLA:**  -- Pretrial Services in --

11      **THE COURT:**  -- of my authority to do this.  I

12   understand that.

13      **MR. PARRELLA:**  I think that, quite frankly, you can.

14   I think that while there may be issues about exactly the

15   manner in which certain conditions are effectuated by Pretrial

16   Services, I think, in this particular case, if it's made

17   extremely clear then, honestly, I think it's up to Pretrial in

18   the other districts to abide by the order.

19           And if they can't, then I guess we need to somehow

20   address it if they're saying that they physically cannot.

21   This doesn't seem to fit into the "cannot" category so --

22      **THE COURT:**  All right.

23      **MR. PARRELLA:**  -- I'll let you (Inaudible - - due to

24   simultaneous colloquy.).

25      **THE COURT:**  All right.  I think I understand the

1   Government too.

2           Mr. Carranza, or -- would someone from Pretrial like

3   to speak to this?

4           **MS. FARAHMAND:**  Your Honor, I would like to start by

5   where we started with Mr. Whelan.

6           One correction that I would like to make, in the --

7   in the report by Officer Carranza dated January 31st, the

8   second page, second paragraph on line 5, it should actually

9   state "Mr. Archer," not "Mr. Whelan."  So this --

10          **MR. WHELAN:**  Thank you.

11          **MS. FARAHMAND:**  So this -- this began with not Mr.

12  Whelan's case, but a separate case for -- that Mr. Archer is

13  (Inaudible - - due to simultaneous colloquy.)

14          **THE COURT:**  Could you remind me who Mr. Archer

15  represents --

16          **MS. FARAHMAND:**  Yes.

17          **THE COURT:**  -- or perhaps Mr. Archer --

18          **MS. FARAHMAND:**  Ethan -- Ethan Miles.

19          **THE COURT:**  Thank you.

20          **MS. FARAHMAND:**  So that is how this all began, just

21  to clarify that to the Court.

22          **THE COURT:**  Right.  This is the District of Arizona?

23          **MS. FARAHMAND:**  Correct.

24          **THE COURT:**  Okay.

25          **MS. FARAHMAND:**  Additionally, with Mr. Whelan's

1  case, or Defendant Cooper, I have spoken to the Southern

2  District of Alabama.  I also want to clarify something with

3  that as well.

4       That district specifically as a whole does not use

5  this program.  The only person that does use this program is

6  the officer that is monitoring this Defendant.

7       It is not a protocol that the whole district uses,

8  and he has actually -- the only reason why he uses it is

9  because he brought it on.  He was trained in this program on

10 the state level, and then when he came to this district --

11 that district (Inaudible - - due to simultaneous colloquy.)

12      **THE COURT:**  So he had particularly expertise --

13      **MS. FARAHMAND:**  Exactly.

14      **THE COURT:**  -- that allowed him to participate?

15      **MS. FARAHMAND:**  Yes.

16      **THE COURT:**  I understand.  Okay.

17      **MS. FARAHMAND:**  So that's -- that's what I wanted to

18 clarify.  I will let Mr. Carranza speak to the thumb drive

19 itself.

20      **THE COURT:**  All right.  Mr. Carranza.

21      **MR. CARRANZA:**  Good morning, Your Honor.

22      **THE COURT:**  Good morning.

23      **MR. CARRANZA:**  I was able to obtain a copy of the

24 thumb drive software that they spoke.  I used it yesterday,

25 played with it yesterday, and I found a significant glitch in

1  the system.  It's something we're still reviewing, but it --

2  the glitch that I found is very significant and it would cause

3  us concern.

4      Our district -- our office is still going to look

5  into the matter and see if it can be resolved or something I

6  did wrong.  I have not -- I have not been trained in the

7  system.  I watched a video.

8      And I believe I provided some information to the

9  Court yesterday, so it's something I cannot recommend that we

10  will do or that's something we can implement in the future.

11  We don't know enough about the system.

12      **THE COURT:**  Well, I -- I appreciate that.  It seems

13  to me that in light of your update, we ought to give Pretrial

14  Services at least some time to complete its assessment.

15  Perhaps it is operator error.  I'm certainly guilty of that on

16  more than one occasion.  So I -- I -- it -- what I'd like to

17  do is the following:

18      Let's keep the status quo.  I'd like to Pretrial

19  another ten days to evaluate this.  Do you think you need more

20  time than that, Mr. Carranza?

21      **MR. CARRANZA:**  Well, Your Honor, I -- in order to be

22  properly trained, I need to contact somebody from --

23      **THE COURT:**  All right.

24      **MR. CARRANZA:**  -- the agency that provides the

25  service so we can get somebody to come out and actually --

1    other than just the basic video that -- it -- it might take

2    longer.

3            **THE COURT:**  Why don't we set this for two weeks.  If

4    you can report back to me that you're having difficulties

5    meeting that deadline, I'll certainly consider that.

6            **MR. CARRANZA:**  We can --

7            **THE COURT:**  I'd like to just have something on the

8    calendar to keep this proceeding.

9            **MR. CARRANZA:**  That -- that's fine, Your Honor.

10           **THE COURT:**  Okay.

11           **MR. CARRANZA:**  But our -- our biggest concern is we

12   -- meaning U.S. California Pretrial -- is looking into this

13   matter.  There's 14 Defendants, 11 districts that supervise

14   that Defendants that the Defendants live outside of our

15   district, one of them being the Northern District of Ohio.

16           Some of these districts -- I believe some of the

17   districts already have policies and procedures in order -- I

18   mean, who's monitoring software or how they can -- how do they

19   implement this condition.

20           Those conditions or that policy and procedure has

21   been adopted by their district.  It might have been approval

22   with their court, approved by their chief.  Our concern is

23   we're going to be asking a district somewhere else outside of

24   Northern District of California to follow this Protocol.

25           There's four districts that don't have a policy or

1   procedure or implement monitoring software. They don't use it

2   at all. They -- all they do is do a manual search of the

3   computer.

4           And for those districts, they will have to implement

5   the policy and procedure and also obtain their court's

6   approval or information from the court what their positions

7   are.

8           So it might -- is that something that can be done

9   fast. It's going to take some time to determine if this

10  software would work and whether the 11 districts outside

11  Northern District of California are willing to use it.

12          **THE COURT:** I appreciate that. I'd -- I'd -- what

13  I'd ask in light of all that that is that, you know, over the

14  next two weeks you and your office do your best to investigate

15  whether this option is -- is feasible here in Northern

16  California and each of the other districts.

17          Candidly, if the report back from Pretrial is they

18  have been unable to confirm or verify that certain districts

19  are able to participate in this option, then I think we just

20  have to take that at that point as a given and fashion either

21  a new requirement or a new inspection protocol or something

22  altogether different in order to address the issue.

23          But I would like to set this for two weeks out to

24  give your office a fair and full opportunity to do the best

25  you can to figure out what is possible.

1          In the meantime, we'll keep things as they are.  I

2   think that will preserve the situation for the Defense and

3   Government under conditions that were originally agreed on by

4   you all, I'll add, and we'll -- we'll see where we are in a

5   couple weeks.

6          Mr. Whelan, you wish to address this?

7          **MR. WHELAN:**  It sounds like the issue has to do with

8   four districts, not 11.

9          **THE COURT:**  That may be.  I --

10          **MR. WHELAN:**  If there are issues with other

11   districts that have scanning capabilities, if some of the

12   Defendant lawyers are not comfortable with it, I'm confident

13   you'll hear about it --

14          And, you know, we're not asking that every district

15   supplant -- districts that already have a monitoring process

16   supplant it with this thumb drive.  I think the issue is that

17   districts that don't have it.

18          **THE COURT:**  Right.

19          **MR. WHELAN:**  And whether the thumb drive is a

20   reasonable, simpler way to do it, and that's being

21   investigated.

22          **THE COURT:**  Well, let's -- let's see what we learn

23   after a couple weeks.  I think we'll keep the situation as it

24   is for the time being, and it's my hope that we're able to

25   move forward.

1          From what I've heard, it doesn't strike me as a huge

2    technological barrier to overcome, but, you know, I don't

3    always see every obstacle out there in implementing a policy.

4          So I'll look forward to hearing from you in a couple

5    weeks, Mr. Carranza.

6          **MR. CARRANZA:**  Thank you, Your Honor.

7          **THE COURT:**  Thank you, sir.  All right.

8          Let's next turn to the issue raised by Mr. Kershaw.

9    It is Mr. Kershaw's motion?

10         **MR. FIGUEROA:**  Yes, Your Honor.

11         **THE COURT:**  Regarding --

12         **MR. CHEW:**  Oh, Your Honor, just --

13         **THE COURT:**  Yes, sir.

14         **MR. CHEW:**  Real quickly, just -- just to clarify.

15         **THE COURT:**  Mr. Chew.

16         **MR. CHEW:**  So will there be another, I guess, status

17   conference before this Court in two weeks, or is it -- is the

18   two weeks the deadline for Mr. Carranza to report to the

19   Court?  I just wanted to clarify.

20         **THE COURT:**  Well, I appreciate your clarifying that,

21   and in light of the logistics required to have you all appear,

22   I am in my mind thinking of a report from Mr. Carranza in --

23         **MR. CHEW:**  Okay.

24         **THE COURT:**  -- two weeks, and then we'll see if we

25   need to reconvene.

1          **MR. CHEW:**  Yeah, because I -- I thought --

2          **UNIDENTIFIED SPEAKER:**  (Inaudible - - due to

3    simultaneous colloquy.)

4          **MR. CHEW:**  -- that would make sense -- it would make

5    sense, Your Honor, because --

6          **THE COURT:**  All right.  Thank you for clarifying

7    that, Mr. Chew.  All right.

8          So just -- again, just so my record is clear here,

9    I'm referring to Mr. Kershaw's motion at docket 174.  Let's

10   talk about Twitter and IRC.  Mr. Figueroa, go ahead.

11         **MR. FIGUEROA:**  Yes, Your Honor.  We believe that the

12   proper analysis is strict scrutiny analysis.  It seems that

13   the People are arguing that the conditions are reasonable, and

14   that's a rational basis approach, and that's wholly

15   inappropriate when a federal court is considering First

16   Amendment issues.

17         So we ask the Court to employ a strict scrutiny

18   analysis and hold the Government to its burden of first

19   establishing a compelling governmental and, second, showing

20   it's narrowly tailored.

21         **THE COURT:**  And what basis are you invoking the

22   strict scrutiny standard?  I don't see, for example, content

23   element to this restriction.  Is there some other basis you're

24   relying upon?

25         **MR. FIGUEROA:**  Yes, Your Honor.  It's core political

1    discourse.  We did submit some proposed tweets from Mr.

2    Kershaw where he wants to engage in political discourse.  The

3    Chief Executive Barack Obama only communicates his Twitter

4    through Twitter, and there's no other way to access it.

5            I guess the prosecution's position is that maybe Mr.

6    Kershaw can glean secondhand from news reports the President's

7    tweets, but that is not an adequate substitute.

8            So we believe that strict scrutiny is required

9    because we're talking about political discourse, the core of

10   the First Amendment.

11           **THE COURT:**  Do you have any thoughts, counsel, about

12   how I might narrowly craft or tailor this restriction?  For

13   example, would you suggest your client be permitted to access

14   tweets using certain hash tags but not others?

15           Is there some way we can focus on what you're

16   entitled to without impinging upon the Government's legitimate

17   concerns here?

18           **MR. FIGUEROA:**  Yeah, that's a possibility.  To allow

19   him to certainly access the tweets issued by the Presidential

20   candidates in the Presidential contest, but I don't know if

21   the hash tags --

22           **THE COURT:**  I'm just --

23           **MR. FIGUEROA:**  My understanding.

24           **THE COURT:**  -- brainstorming out loud here.

25           **MR. FIGUEROA:**  Yeah.

1    **THE COURT:**  It seems to me what you're saying is

2    whatever way we cut this your position and, I take it from the

3    joinder, a number of the Defendants' position is an absolute

4    blanket ban is not appropriate and you'd like to see some

5    opportunity for participation?

6    **MR. FIGUEROA:**  Yes, Your Honor.  We believe a

7    categorical -- categorical prohibition is inappropriate.

8    I tried to negotiate with the Government to come up

9    with some sort of compromise where he could have narrowly

10   tailored conditions that would still allow Mr. Kershaw to --

11   **THE COURT:**  I take --

12   **MR. FIGUEROA:**  -- engage in political discourse.

13   **THE COURT:**  -- it those discussions we're fruitful?

14   **MR. FIGUEROA:**  They were not.

15   **THE COURT:**  All right.  All right.  From the

16   Government, who wants to speak to this, Mr. Chew?

17   Thank you, Mr. Figueroa.

18   **MR. CHEW:**  Well, thank you, Your Honor.  I think a

19   couple things need to be considered.

20   First of all, the Court should note that these are

21   not conditions that the Government unilaterally imposed upon

22   the Defendants.  These are conditions that the Defendants

23   negotiated, you know, with -- with the Government and agreed

24   to so --

25   **THE COURT:**  And with the Court essentially.

1          **MR. CHEW:**  And -- and --

2          **THE COURT:**  -- right?

3          **MR. CHEW:**  Yes.  The -- the Defendants agreed --

4     most Defendants, except for Mr. Kershaw, agreed twice, both on

5     the record in court and in the stipulations.

6          Second, we -- the Government doesn't believe that

7     the current restrictions against Twitter and the IRC violate

8     or infringe upon the First Amendment.

9          They don't restrict the Defendants' ability to

10    express his views on -- on the political discourse.  They

11    don't -- they don't endorse or sensor a particular point of

12    view.  They're content -- they're content neutral, so it's the

13    Government's position is strict scrutiny is not appropriate in

14    -- in -- in -- in this case.

15         The Government -- the Defendants -- I'm sorry,

16    strict scrutiny is usually applied to laws, ordnances,

17    regulations and policies.  The Government is unaware of any

18    case where strict scrutiny is applied to a -- to a term of

19    pretrial release.

20         Even -- even if strict scrutiny did apply, the --

21    the restrictions are narrowly tailored to meet a compelling

22    Government interest.  The Government did not seek to -- to

23    limit any use of computers.  The Government did not seek to --

24    to limit internet use -- you know, to ban internet use if you

25    ban the use of computers.  In that sense, they are narrowly

1    tailored.

2           The Defendant has multiple avenues to -- to express

3    his political opinion or, you know, to -- to communicate with

4    others.  He's got chat rooms.  He's political blogs.  He's got

5    email.  There are a number of viable alternatives.

6           And as for the compelling Government interest, the

7    Anonymous Group communicates through IRC and through Twitter.

8    The Anonymous Group sends out its information, coordinates its

9    plans through -- you know, through -- through -- through those

10   means.

11          If -- if the Court were to cut off the Defendants

12   from IRC and Twitter, the Courts would be cutting off -- the

13   Courts would be cutting off the Defendants from their flow of

14   information and communication from Anonymous, and that's what

15   the Government is seeking.  That is the compelling Government

16   interest.

17          Now, if the -- if the Court were to adopt the

18   Defendants' point -- the Defendants' kind of point of view as

19   to the broadness of the constitutional rights versus the

20   court's power, the Court would be negating a large part of its

21   own power because under the Defendants' interpretation, the

22   Court wouldn't be able to fashion, for example, a condition

23   limiting who the -- who the Defendant would associate with

24   because that would, you know, infringe upon their First

25   Amendment right of --

1      **THE COURT:**  Right.  Presumably, for example, if I

2  have a restriction and a release order that says the Defendant

3  can't talk to a Codefendant that would, by definition,

4  restrict their ability to talk about the President, other

5  candidates for the office and so forth, and yet we do that all

6  the time.

7      **MR. CHEW:**  Yes.

8      **THE COURT:**  Right?

9      **MR. CHEW:**  That's -- that's correct, Your Honor.

10  And so the Government believes that these -- these

11  prohibitions against the use of Twitter and the IRC are

12  appropriate restrictions.

13      **THE COURT:**  All right.  Thank you, Mr. Chew.

14      Any -- any rebuttal, Mr. Figueroa?

15      **MR. FIGUEROA:**  Yes, Your Honor.  The Government

16  proffers no particularized evidence against Mr. Kershaw

17  showing that he personally has misused or improperly used

18  either Twitter or IRC, yet the Government wants to ban him

19  categorically from those modes of expression.

20      There's no concrete or particularized evidence

21  against Mr. Kershaw.  That's one of the factors that's

22  enumerated in 3142(g)(2).  It's the weight of the evidence

23  against the person.

24      Instead the Government brings up this nebulous group

25  of unknown others, the Anonymous Group, and says the Anonymous

1   Group does this and, therefore, Mr. Kershaw must be banned

2   from IRC and Twitter, but there's no evidence against Mr.

3   Kershaw.

4        And without a proffer that's concrete as to Mr.

5   Kershaw, the weight to -- of the evidence against Mr. Kershaw

6   is minimal.

7        **THE COURT:**  So Mr. Figueroa, you -- you present a

8   number of compelling arguments.  It would seem to me, though,

9   that all of these arguments could have been, and perhaps were,

10  presented earlier.

11       In order to reconsider or modify conditions of

12  release there has to be something new, would you agree, for

13  the Court to consider or to deliberate on?  What's new in all

14  of this?  What's changed between when I first imposed these

15  conditions and today?

16       **MR. FIGUEROA:**  For Mr. Kershaw, he accepted the

17  conditions initially so that he could have access to a

18  computer, but we did notify the Government that we reserved

19  the right to dispute the First Amendment issues, and we did

20  bring it up in due course.

21       We have never forfeited that argument.  We have

22  always objected to the First Amendment issue, but we did agree

23  initially so that we could get a better grasp on the evidence

24  to see if -- if the Government did have concrete evidence

25  of --

1    **THE COURT:**  Your point is you haven't seen anything

2  yet?

3    **MR. FIGUEROA:**  That's right.

4    **THE COURT:**  All right.  I think I understand your

5  position.

6    **MR. CHEW:**  Well, Your Honor, if the --

7    **THE COURT:**  Go ahead, Mr. Chew.

8    **MR. CHEW:**  -- Defense would like, you know, evidence

9  concerning Mr. Kershaw's use of IRC, they only have to refer

10  to the search warrant of his premises where -- I'm sorry, not

11  the search warrant.  They only have to report to -- I'm sorry.

12    They only have to refer to certain reports where Mr.

13  Kershaw did provide IRC logs from his computer, I think, that

14  were related to -- to -- to the -- to Anonymous.

15    **THE COURT:**  All right.

16    **MR. FIGUEROA:**  But, Your Honor, where -- where's the

17  evidence about Twitter?  You know, there's no -- no -- no

18  mention of Twitter whatsoever.

19    **THE COURT:**  All right.  I think I understand your

20  views.

21    Mr. Nolan, do you wish to speak on behalf of your

22  clients?

23    **MR. NOLAN:**  Only -- only to -- only to add that --

24  that for -- for those of us that are a little older, we didn't

25  have -- I didn't have any idea how important Twitter was.  I'm

1   going to have to learn how to use Twitter, and when I agreed

2   to it I certainly didn't have an appreciation for Twitter.

3   Now, I do because it seems like I'm going to have to learn it.

4           So the agreements made, you know, at the time

5   without being well thought out, and certainly the Twitter one,

6   at least -- you know, I'll claim ineffective assistance of

7   counsel, if I'd thought it out, thought well, maybe now I have

8   to learn Twitter.  So you know, we think these things

9   through --

10          **MR. CHEW:**  Could we get that --

11          **MR. NOLAN:**  Yeah.

12          **MR. CHEW:**  I'd like that transcript, actually.

13          **MR. NOLAN:**  Exactly.  Exactly.  So -- so I mean,

14  that -- that is the change.

15          **THE COURT:**  No.  I understand.

16          **MR. NOLAN:**  You know, as we get together, people

17  coming from all over, and -- and -- and I just -- I guess I

18  may have to learn Twitter.

19          **THE COURT:**  All right.  Thank you.

20          **UNIDENTIFIED SPEAKER:**  Your Honor, if I may because

21  I took the lead of the Defendants when we negotiated.

22          You know, the Government and the Defense spent a lot

23  of time and effort, weeks, reaching what we believed to be a

24  reasonable resolution.  I'd be the first to admit that in

25  dealing with it, as with my colleague, slipped right through

1    it.

2          We now know that even things have proven workable

3    for six months that there's now been an application to rewrite

4    it by Pretrial Services.  And I think very much the same

5    position that now we've had an opportunity to see this, and

6    counsel have had an opportunity to reflect upon and start

7    looking at the evidence, so they'd like to be in the same

8    position to ask the Court to consider it.

9          To the extent that people are now being forced with

10   a waiver -- it was a waiver on my part initially, and again,

11   it was done with the best of intention to facilitate this and

12   move this along.

13         And just as there are claims that certain things are

14   not working in certain respects and the Court is revisiting it

15   -- revisiting it, so, too, I -- I respectfully suggest the

16   same standard should apply in terms of those.

17         **THE COURT:**  All right.  I understand your view.  All

18   right.  That -- that matter is submitted.  I will, again, rule

19   shortly.

20         Let's turn to -- unless I'm overlooking something, I

21   believe we need to address some specific issues for particular

22   Defendants and their bail conditions.

23         I'm referring to Mr. Collins, and I'm looking at

24   you, Mr. Leeming.

25         **MR. LEEMING:**  I see that, Your Honor.

1          **THE COURT:**  I understand Mr. Collins is on by

2     telephone, if that -- Mr. Collins, are you there, sir?

3          **DEFENDANT COLLINS:**  Yes, sir.

4          **THE COURT:**  All right.  Welcome.

5          Mr. Leeming, why don't you speak to the violations

6     that have been alleged.

7          **MR. LEEMING:**  Yes.  There's -- there's two

8     violations, Your Honor.  The second one, I think, is the

9     easiest, which is, "Furthermore, Mr. Collins is refusing to

10    provide information about his computer, which has prevented

11    the supervising office from inspecting his computer as

12    required."

13         My understanding is what he did was refuse to sign

14    the form, which we submitted to you.  It's different than what

15    you ordered.  I addressed that earlier.  If you have any more

16    questions about that --

17         **THE COURT:**  No.  I think I understand your view on

18    that.

19         **MR. LEEMING:**  Okay.  Fine.  The other is that he has

20    tested positive for cocaine, from what I understand is twice

21    that has been verified and a third time, which apparently was

22    yesterday, and so this is -- this was verified by gas

23    chromatograph.

24         I have spoken to him at length about this.  It is an

25    unfortunate situation that he is in.  He participated just

1   briefly in a couple of different double blind treatment

2   options.

3           I have a letter from his physician, which I would

4   submit to the Court.  I chose not to efile it.  The Government

5   and Pretrial service have seen it.  It is summarizing his

6   medical condition briefly at the moment.

7           There was a period where he had to take no

8   medications to get ready for a new treatment course, and

9   during that time he took various less than clinically approved

10  medications.  And it is -- I think he's willing to admit that

11  -- and Dennis, please feel free to correct me if I'm wrong in

12  this -- that in ingesting those unapproved medications he

13  ended up testing positive for cocaine.

14          With that, I think he is willing to agree that he

15  violated the terms of his release by doing so, and that he

16  would participate in some kind of treatment or counseling, as

17  necessary, to address that.

18          There are a couple of concerns we have about that.

19  One is that he does not drive.  He has some mobility issues.

20  He can get rides.  He obviously did today.

21          And so that is our position, and I -- and the

22  intended admission, or at least the vague text of it for this

23  morning.

24          **THE COURT:**  All right.  Thank you, Mr. Leeming.

25          Mr. Carranza, I have your memo, but is there

1   anything you wish to add?

2          **MR. CARRANZA:**  Just the positive drug test from --

3   presumptive positive drug test from last night that we were

4   informed of this morning.

5          And also, we received information from Ohio that Mr.

6   Collins informed that he used some medication that did not --

7   he was not authorized to use, and it might have been the

8   reason he tested positive for cocaine last night.

9          I spoke with the officers in Ohio.  They're willing

10  to work with Mr. Collins.  But he's already been to counseling

11  once, and was basically terminated for noncompliance or not

12  willing to participate in -- with the services.

13         I just wanted to make sure that if Mr. Collins is

14  given the opportunity that he takes advantage of that

15  opportunity and he fully complies with the program, and any

16  further violations could result in him coming back to this

17  district to address further violations.

18         **THE COURT:**  All right.  I -- I take it from Mr. --

19  thank you, Mr. Carranza.

20         I take it from Mr. Leeming's remarks that, at least

21  at this point in time, Mr. Collins is expressing a willingness

22  to participate in drug counseling as ordered by the Court; is

23  that right, Mr. Leeming?

24         **MR. LEEMING:**  Is that right, Mr. Collins?

25         **DEFENDANT COLLINS:**  Yes.

1       **THE COURT:**  All right.  Mr. Collins, I'm going to

2 modify your conditions of release to require that you

3 participate in drug counseling in light of this violation.

4       Sir, I'm going to be very direct and blunt with you.

5 If you blow this one, you're going to be brought back to this

6 district and we're going to address a more serious and

7 substantial modification of your release, indeed, your release

8 at all.

9       I just want to be very clear with you, sir, that

10 when this Court issues conditions upon which you are to be

11 released from custody, those conditions are to be complied

12 with to the letter.  And it troubles me, to say the least,

13 that I've learned that you have not been able to do that.

14       I'm going to give you this opportunity.  As Mr.

15 Carranza just indicated, it is in your interest to take

16 advantage of it.  If I'm informed that you have not, as I

17 said, there will be consequences, and you need to that.  Do

18 you understand that, sir?

19       **DEFENDANT COLLINS:**  Yes, sir, I do.  And may I --

20       **THE COURT:**  All right.  Mr. Leeming, is there

21 anything further on this?

22       **MR. LEEMING:**  No, Your Honor.

23       **THE COURT:**  All right.  Let's consider that

24 addressed.  Thank you, Mr. Carranza.

25       **MR. CARRANZA:**  Thank you, Your Honor.

1      **THE COURT:**  All right.  Well, counsel -- Mr.

2  Figueroa?

3      **MR. FIGUEROA:**  Your Honor, I'd like to address the

4  issue of urinalysis.

5      **THE COURT:**  I was just going to turn to that, so why

6  don't you -- why don't you begin.

7      **MR. FIGUEROA:**  Thank you, Your Honor.  We request

8  that the condition requiring analysis be terminated.  We don't

9  believe it's required.  There's no proof that Mr. Kershaw uses

10  any illegal or drugs of any kind other than alcohol.

11      **THE COURT:**  All right.  So I take it your basis for

12  requesting this modification is Mr. Kershaw's sterling record

13  to date on this -- under this Protocol, and the -- the burden

14  that's associated with complying with this test regime going

15  forward; is that --

16      **MR. FIGUEROA:**  Yes.  He's tested clean with -- for

17  drugs.  And we spoke with Pretrial Services after the last

18  court date, and it appears that there may not be a problem

19  with this request.

20      **THE COURT:**  All right.  Mr. Carranza, do you want to

21  address this one?

22      **MR. CARRANZA:**  Yes, Your Honor.  I spoke with the

23  supervising officer for Mr. Kershaw that is the district --

24  District of Utah, and he informed that all tests had been

25  negative.

1          The way they do alcohol testing is via urine

2     samples.  So although he won't be -- if the Court is in

3     agreement -- he won't be testing for drugs, but he still is

4     required to submit to urine samples for alcohol.

5          **THE COURT:**  All right.  It would seem, Mr. Figueroa,

6     that that would -- that would still impose a burden on Mr. --

7     on Mr. Kershaw, correct?

8          **MR. FIGUEROA:**  Yes, Your Honor.  And we're asking

9     that the alcohol condition be modified to order him to refrain

10    from excessive use of alcohol, but not to prohibit him from

11    using alcohol whatsoever.  He wants to be able to drink a

12    couple beers during a football game.

13          **MR. CARRANZA:**  Well, Your Honor --

14          **THE COURT:**  Yes.

15          **MR. CARRANZA:**  -- there's some issues with that.

16          **UNIDENTIFIED SPEAKER:**  The season is over.

17          **UNIDENTIFIED SPEAKER:**  Basketball.

18          **THE COURT:**  You took my line, counsel.  Go ahead,

19    Mr. Carranza.

20          **UNIDENTIFIED SPEAKER:**  Sorry about that, Judge.

21    I'll refrain from gratuitous comments again.

22          **THE COURT:**  Go ahead, sir.

23          **MR. CARRANZA:**  An officer conducted a home visit.

24    He found a substantial amount of alcohol in the residence.

25    Mr. Kershaw admitted that he had gone through counseling, and

1  on the way home he had a couple beers on the road and there

2  was some alcohol in the vehicle.  The officer made him throw

3  it out.

4        So at this time we would oppose that modification

5  be --

6        **THE COURT:**  Eliminated completely?

7        **MR. CARRANZA:**  -- eliminated.

8        **THE COURT:**  Yeah.

9        **MR. CARRANZA:**  I think there should be no alcohol at

10  all.

11        **THE COURT:**  Anything further, Mr. Figueroa?

12        **MR. FIGUEROA:**  Submitted.

13        **THE COURT:**  All right.  Well, I am -- based on the

14  information I have received, I'm -- I'm not persuaded that a

15  modification is warranted at this time.  I am concerned about

16  evidence of excessive use.

17        However, I think a prohibition on excessive use

18  alone would be insufficient to assure compliance, and so I

19  will keep the urinalysis requirement as it stands.

20        Counsel, have I missed anything on our agenda?

21        **MR. MILLER:**  Pardon me, Your Honor?

22        **THE COURT:**  Yes, sir.

23        **MR. MILLER:**  My name is Mark Miller.  I'm the

24  aftercare treatment specialist in Northern Ohio.  I'm with Mr.

25  Collins here.

1      **THE COURT:**  Well, sir.  Go ahead.

2      **MR. MILLER:**  I apologize for interrupting, but Mr.

3  Collins had some issue with the treatment agency that we are

4  referring him to for services, which we --

5      **THE COURT:**  Go ahead, sir.  I'm listening.

6      **MR. MILLER:**  Okay.  Which we intend to counseling

7  there.  However, he made -- to wanting to find his own

8  counseling or counseling services, so I just wanted to address

9  that before we leave this phone conference.

10      **THE COURT:**  All right.  Well, you -- you -- you were

11  breaking a little bit, sir, so I may have missed a couple of

12  the things you were saying.

13      Is the issue the where Mr. Collins is receiving his

14  treatment or --

15      **MR. MILLER:**  Well, he has indicated that -- that he

16  has a problem with where he is at least going to receive the

17  treatment.  That's our contract agency that we use in this

18  district that provides services for almost all of our Pretrial

19  and probation either offenders and Defendants.

20      He made some vague reference to he and his attorney

21  working out something to find another counselor that would be

22  more suitable for him, but our intention here would be to

23  continue him with that treatment agency, unless or until we

24  found some other counselor that we found to be suitable.

25      **THE COURT:**  All right.  Well, I have his attorney

1    standing at the podium.  So Mr. Leeming, do you want to speak

2    to this?

3         **MR. LEEMING:**  Of course I'm not familiar with the

4    specific program in Ohio that's the subject of this.  I have

5    heard of some friction.  My suggestion is this:

6         We've got two weeks for Pretrial to look into some

7    other things.  Perhaps I could work with the Federal Defenders

8    Office and Pretrial Services back in Ohio and explore

9    different options and report to the Court and to Pretrial, and

10   we can -- I think we can solve this problem.

11        **THE COURT:**  All right.  I think that's a reasonable

12   approach.  We'll keep things as they stand over the next two

13   weeks.  At the next conference, whenever that may be -- I want

14   just to be clear.  We are not setting a conference for two

15   weeks from today.  I'm simply going to receive a report from

16   Mr. Carranza.

17        **MR. LEEMING:**  And is it acceptable for me to send a

18   letter to you or an email to you -- to your clerk, Your Honor?

19        **THE COURT:**  Absolutely.

20        **MR. LEEMING:**  Very good.

21        **THE COURT:**  All right.  Sir, does that address your

22   issue for the time being?  I'm not hearing anyone in the

23   Northern District on the phone.

24        **MR. LEEMING:**  I take it there's no objection.

25        **THE COURT:**  All right.  On that note, we will stand

1  in recess.  Thank you, counsel.

2          **MR. LEEMING:**  Thank you.

3              (Proceedings adjourned at 11:22 a.m.)

**CERTIFICATE OF TRANSCRIBER**

    I certify that the foregoing is a true and correct transcript, to the best of my ability, of the above pages of the official electronic sound recording provided to me by the U. S. District Court, Northern District of California, of the proceedings taken on the date and time previously stated in the above matter.

    I further certify that I am neither counsel for, related to, nor employed by any of the parties to the action in which this hearing was taken; and, further, that I am not financially nor otherwise interested in the outcome of the action.

_____    9/18/2012

Signature of Transcriber      Date